# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 21, 2019

Lyle W. Cayce
Clerk

No. 18-40347

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

RAFAEL TELLO,

> Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and DAVIS and ELROD, Circuit Judges.

CARL E. STEWART, Chief Judge:

A federal grand jury returned a three-count indictment charging Rafael Tello with transporting an illegal alien within the United States by means of a motor vehicle. At an immigration checkpoint, the aliens were found hidden in a storage compartment in the sleeper area of the tractor-trailer that Tello was driving. The case proceeded to trial on the first two counts. Midway through the trial, after the two Border Patrol agents had testified, Tello moved to suppress the evidence found during the immigration-checkpoint stop. The district court denied the motion and the jury found Tello guilty of both counts. Tello was sentenced to concurrent terms of 27 months of imprisonment and two years of supervised release. For the reasons below, we AFFIRM.

No. 18-40347

I.

Shortly before 1:00 a.m. on August 1, 2017, a tractor-trailer entered the primary inspection lane at the U.S. Border Patrol checkpoint south of Falfurrias, Texas. Agent Villanueva was on duty in the primary inspection lane. A Border Patrol service canine and its handler were working with him.

Tello was driving the tractor-trailer. Agent Villanueva's first question was: "[A]re you a citizen – are you a United States citizen?" He replied that he was a naturalized citizen. Agent Villanueva was satisfied with this answer so he did not ask for proof of citizenship.

Agent Villanueva next asked Tello what he was hauling in the trailer. He asked this question to give the Border Patrol service canine more time to conduct a canine sniff of the tractor-trailer:

> Because at that point, kind of I looked – because usually when I start [questioning], I also keep in mind that I have the K9 handler working with me; because sometimes, you know, the vehicles coming up to our inspection, and the dog might be alerting right away, but – and sometimes, we question these occupants. And we might be doing a simple question, so we might relieve the vehicle right away. But at this time, the K9 [handler] kind of glanced over at me, you know, give me a little bit more time. So that's kind of why I questioned a little bit more.

Tello answered that he was hauling carrots and handed the agent a bill of lading. Agent Villanueva asked him whether he had made any stops after loading the carrots in the trailer. Tello answered that he was coming from Pharr, Texas and had not made any stops. Agent Villanueva testified that Tello did not appear to be nervous and there was no indication that he was hiding anything.

The canine handler told Agent Villanueva that he needed to send the tractor-trailer to the secondary inspection area. The agent then asked Tello for

2

No. 18-40347

consent to search and backscatter (x-ray) the tractor-trailer, and he agreed. This happened about 30 seconds into the checkpoint stop.

In the secondary inspection area, another agent (Agent Reyes) boarded the tractor-trailer to conduct a physical inspection in advance of the backscatter inspection, a routine precaution to minimize the risk of exposing possible occupants to radiation. Under the bed in the sleeper area of the tractor-trailer was a small hole through which Agent Reyes could see a person's torso. He unlatched the bed and found three persons hiding in the storage compartment. These persons were citizens of Honduras who were illegally present in the United States.

On August 23, 2017, a federal grand jury returned a three-count indictment charging Tello with transporting an illegal alien within the United States by means of a motor vehicle in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(II) and (B)(ii).

On November 16, 2017, the case proceeded to a jury trial on the first two counts.[1] During the one-day trial, the government presented Agents Villanueva's and Reyes's testimony on the details of the immigration-checkpoint inspection. Midway through the trial, after the agents testified, Tello moved to suppress the evidence found during the immigration-checkpoint stop.[2] Tello argued that the agents had impermissibly extended the immigration-checkpoint stop beyond its legitimate, limited immigration purpose before asking him for his consent to search the tractor-trailer.

---

[1] The government moved to dismiss the third count in the indictment because the alien was a juvenile when he was taken into custody.

[2] Motions to suppress evidence must be made before trial. Fed. R. Crim. P. 12(b)(3)(C). A court can consider an untimely motion if the party shows good cause. *See* Fed. R. Crim. P. 12(c)(3). Tello does not specifically mention good cause, but defense counsel stated that he was not aware until Agent Villanueva testified that when he completed his inspection at the primary lane, Tello was detained to allow the dog to continue to search the vehicle.

No. 18-40347

The district court denied the motion to suppress. The jury found Tello guilty of both counts. On April 11, 2018, the district court sentenced him to concurrent terms of 27 months' imprisonment and two years' supervised release. Tello appeals the district court's denial of his motion to suppress.

II.

In reviewing the denial of a motion to suppress, we review factual findings for clear error and legal conclusions de novo. *United States v. Rodriguez*, 702 F.3d 206, 208 (5th Cir. 2012). We review the evidence "in the light most favorable to the prevailing party." *United States v. Wise*, 877 F.3d 209, 215 (5th Cir. 2017) (citation omitted). We give particular deference to findings where the court's denial of the suppression motion was based on live testimony because the judge had the opportunity to observe the witness's demeanor. *United States v. Tovar*, 719 F.3d 376, 384 (5th Cir. 2013); *see also United States v. Wright*, 777 F.3d 769, 773 (5th Cir.) (same), *cert. denied,* 135 S. Ct. 2821 (2015).

III.

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 585 (2018) (brackets in original) (quoting U.S. Const. amend. IV). Ordinarily, a search or seizure is unreasonable "in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (citation omitted). At a fixed checkpoint, however, which has as its primary purpose identifying illegal immigrants, vehicles may be briefly detained in furtherance of that purpose, and the occupants questioned, without either a warrant or any individualized reasonable suspicion. *United States v. Jaime*, 473 F.3d 178, 181 (5th Cir. 2006). The permissible duration of the stop includes the time necessary to inquire about citizenship status, ascertain the number and

identity of the vehicle's occupants, request documentation, and seek consent to extend the detention. *United States v. Machuca-Barrera*, 261 F.3d 425, 433 (5th Cir. 2001).

We have avoided scrutinizing the questions a Border Patrol agent asks at the checkpoint, instead focusing on the duration of the stop:

> We decline a protocol that measures the pertinence of questions to the immigration purpose by an after-the-fact standard for admissibility at trial. So long as a checkpoint is validly created, policing the duration of the stop is the most practical enforcing discipline of purpose. The key is the rule that a stop may not exceed its permissible duration unless the officer has reasonable suspicion. We deploy a test that is both workable and which reinforces our resistance to parsing the relevance of particular questions. To scrutinize too closely a set of questions asked by a Border Patrol agent would engage judges in an enterprise for which they are ill-equipped and would court inquiry into the subjective purpose of the officer asking the questions.

*Id.* at 434 (footnote omitted); *see also Jaime*, 473 F.3d at 183 ("[I]t is the length of the detention, not the questions asked, that makes a specific stop unreasonable.") (citation omitted); *United States v. Castille*, 478 F. App'x 868, 869 (5th Cir. 2012) (per curiam) (unpublished) ("The scope and duration of the immigration checkpoint stop remained valid even though [the agent] had concluded that both [defendants] were United States citizens before he asked for consent to search.").

Border Patrol agents may conduct a canine sniff to search for drugs or concealed aliens at immigration checkpoints so long as the sniff does not lengthen the stop beyond the time necessary to verify the immigration status of a vehicle's passengers. *United States v. Ventura*, 447 F.3d 375, 378 (5th Cir. 2006). The critical question is not whether the canine sniff occurs before or after the purpose of the stop is completed, but whether conducting the sniff

prolongs the purpose of the stop. *Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015).

Tello avers that the immigration-inspection purpose of the checkpoint stop was completed when Agent Villanueva received the answer that Tello is a United States citizen and was satisfied by that answer. He argues that, as the agent admitted at trial, the questions about what he was hauling in his trailer and whether he had any stops after loading the trailer were unrelated to his citizenship. Rather, the agent's purpose in asking the questions was to give the Border Patrol service canine more time to conduct a canine sniff of the tractor-trailer to look for violations of immigration law, which Tello maintains extended the stop beyond its permissible scope and made it unconstitutional.

Viewing the evidence in the light most favorable to the government, *Wise*, 877 F.3d at 215, we find that the canine sniff here did not prolong the immigration stop. Tello does not dispute that the stop lasted approximately 30 seconds. Agent Villanueva asked Tello about his citizenship, cargo, and travel, all of which are permissible questions. As we have stated, "questions about travel including origin and destination would be commonplace for an agent to ask during an immigration inspection." *United States v. Alvarez*, 750 F. App'x 311, 313 (5th Cir. 2018) (per curiam) (unpublished).

When Agent Villanueva started questioning Tello about his citizenship, the canine and its handler were already circling the tractor-trailer. Therefore, Agent Villanueva's questioning occurred simultaneously with the canine sniff. At most, mere seconds elapsed before the dog alerted and Tello consented to a search. *See United States v. McMillon*, 657 F. App'x 326, 330 (5th Cir. 2016) (per curiam) (unpublished) (noting that if an agent requests consent to extend the duration of a checkpoint stop, or if probable cause arises, then the stop's countable duration is measured only up until the time of consent or probable cause).

No. 18-40347

Moreover, the duration of the stop was significantly less than or comparable to the time frames we have found acceptable for immigration stops. *See Machuca-Barrera*, 261 F.3d at 435 (holding that questions that "took no more than a couple of minutes" were "within the permissible duration of an immigration checkpoint stop"); *McMillon,* 657 F. App'x at 331 ("A checkpoint stop lasting approximately thirty to forty seconds to allow border patrol agents to ask citizenship and travel questions and to request consent for a search is of a sufficiently limited duration under our precedent.").[3] However, Tello criticizes the length-based approach to judging the permissible duration of a stop created by *Machuca-Barrera* and avows that it cannot survive *Rodriguez*.

Tello's argument overextends *Rodriguez*. *Rodriguez* involved a traffic stop. 135 S. Ct. at 1612. The officer checked the defendant's license and registration, the passenger's license, and ran a records check on them. *Id.* at 1613. The officer then called for a second officer and issued a warning ticket. *Id.* Although "all the reason[s] for the stop" were "out of the way," the defendant was not "free to leave" and refused to allow the officer to walk his dog around the SUV. *Id.* at 1613 (brackets in original). When the second officer arrived, the original officer retrieved his dog who alerted. *Id.* Approximately

---

[3] *See also United States v. Hipolito-Ramirez,* 657 F. App'x 271, 272–73 (5th Cir. 2016) (per curiam) (unpublished) (rejecting argument that one minute between investigation of immigration status and consent to search suitcase was unreasonable); *Castille*, 478 F. App'x at 869 (noting that where agent spent 30 seconds asking each defendant about his citizenship status and for consent to search, stop "lasted no longer than necessary to fulfill its immigration-related purpose") (citation omitted); *United States v. Hinojosa-Echavarria*, 250 F. App'x 109, 113 (5th Cir. 2007) (per curiam) (unpublished) (observing that one-to-one and one-half minute stop was within the time approved in *Machuca-Barrera* and did not exceed the permissible duration); *United States v. Reyes*, 243 F. App'x 858, 859 (5th Cir. 2007) (per curiam) (unpublished) (finding that two to three minute inspection was a "brief time" within the "permissible duration"); *Jaime*, 473 F.3d at 185 (holding that duration of detention from first question asked until defendant gave consent to search her bag was less than half a minute and was not excessive).

seven or eight minutes had elapsed since the officer had issued the warning ticket. *Id.* A search "revealed a large bag of methamphetamine." *Id.* The overall duration of the stop was 29 minutes. *Id.* at 1617 (Thomas, J., dissenting).

The defendant moved to suppress the evidence and the magistrate judge found that, because the post-warning detention and search were not supported by reasonable suspicion, a Fourth Amendment violation had occurred. *Id.* at 1613. However, the magistrate judge concluded that, consistent with Eighth Circuit precedent, the wait was a de minimis intrusion. *Id.* Adopting the magistrate judge's factual findings and legal conclusions, the district court denied the motion, and the Eighth Circuit affirmed. *Id.* at 1613–14. The Supreme Court granted certiorari on the question of "whether police routinely may extend an otherwise-completed traffic stop, absent reasonable suspicion, to conduct a dog sniff." *Id.* at 1614.

The Supreme Court reversed, holding that authority for the traffic stop ends "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* In addition to determining whether to issue a traffic ticket, an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," but not in a way that "measurably extend[s] the duration of the stop." *Id.* at 1615 (citation omitted). These inquiries, such as checking a driver's license, registration, and insurance and determining whether there are outstanding warrants, further the purpose of the traffic laws and ensure "that vehicles on the road are operated safely and responsibly." *Id.*

Tello argues that *Rodriguez* prohibits officers at immigration checkpoints from asking anything other than a brief question or two directly about citizenship and for supporting documentation. However, the Supreme Court recognized in *Martinez-Fuerte* that an immigration stop may take up to five minutes, and the intrusion, which can include referral to secondary inspection, "is sufficiently minimal that no particularized reason need exist to

justify it." 428 U.S. at 563. "Border Patrol officers must have wide discretion in selecting the motorists to be diverted for the brief questioning involved," *id.* at 563–64, and "incidents of checkpoint operation also must be committed to the discretion of such officials." *Id.* at 559 n.13.

*Rodriguez* does not change this law. Notably, *Rodriguez* dealt with a traffic stop; this is an immigration stop where canine sniffs are more relevant to the purpose of the stop. *Cf. Rodriguez*, 135 S. Ct. at 1615 ("[A] dog sniff is not fairly characterized as part of the officer's traffic mission."). *Rodriguez* also does not dictate a script that agents must follow. Rather, *Rodriguez* simply allows for stops of a "tolerable duration"—a duration that is circumscribed by the reason for the stop. *Id.* at 1614. The Supreme Court cautioned against investigation into other possible crimes which add time to the stop and can make the continued seizure unconstitutional. *Id.* at 1615–16.

There is no evidence in this case that the canine was looking for drugs or other possible crimes. Agent Villanueva testified that the handler and canine were conducting an immigration inspection. Agent Villanueva agreed that he "wanted to make sure that the dog had time to finish its inspection of the vehicle" and that it "probably takes a little more time for a Border Patrol K9 to sniff a tractor-trailer than a four-door sedan." The canine handler noted he was trying to determine whether "there's an immigration violation, even something going on in a vehicle that you can't see, because someone's hidden somewhere[.]" This type of checkpoint operation, lasting approximately 30 seconds, is reasonable and fits squarely within the officials' discretion and case law. *See Martinez-Fuerte*, 428 U.S. at 557 ("While the need to make routine checkpoint stops is great, the consequent intrusion on Fourth Amendment interests is quite limited.").

Tello makes a secondary argument: his consent did not dissipate the taint of the prior constitutional violation. Because we find that the stop was

constitutionally permissible, we are not obligated to reach the consent issue. *See United States v. Brigham*, 382 F.3d 500, 512 (5th Cir. 2004) (en banc) ("Absent a Fourth Amendment violation, [the defendant's] consent to search the vehicle was not unconstitutionally tainted."). Nevertheless, we note that Tello gave valid consent.

Consent given after an unconstitutional detention is analyzed under a two-pronged inquiry: "(1) whether the consent was freely and voluntarily given; and (2) whether the consent was an independent act of free will." *United States v. Macias*, 658 F.3d 509, 522 (5th Cir. 2011). As previously discussed, Agent Villanueva did not unreasonably seize Tello. Agent Villanueva was not holding any of Tello's documents, and "[t]he record provides no basis for finding that he did not voluntarily answer the officers' questions and consent to their requests." *Wise*, 877 F.3d at 222. As such, the validity of Tello's consent is without doubt.

## IV.

The district court's judgment is AFFIRMED.